Filed 2/10/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| STEPHANIE KELLEY, | B244098 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BS 135139) |
| v. | |
| CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD, | |
| Defendant and Respondent; | |
| MERLE NORMAN COSMETICS, INC., | |
| Real Party in Interest and Appellant. | |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. James C. Chalfant, Judge. Affirmed.

O'Melveny & Myers, Michael G. McGuinness and Usama Kahf for Real Party in Interest and Appellant.

Teren Law Group and Pamela M. Teren for Plaintiff and Respondent.

Phillip Juntai Matsumoto, Office of the Attorney General, for Defendant and Respondent.

_____

Merle Norman Cosmetics, Inc., appeals from the judgment overturning the California Unemployment Insurance Appeals Board's decision to deny unemployment benefits to Stephanie Kelley. We affirm because there was substantial evidence that Kelley did not constructively quit and was instead fired.

## FACTS AND PROCEDURAL HISTORY

1.    *Factual Overview*

In May 2010 Stephanie Kelley went on a stress leave from her job as marketing director for Merle Norman Cosmetics, Inc., one month after she filed a claim with the California Department of Fair Employment and Housing alleging that the company was retaliating against her for reporting ongoing sexual harassment.

Kelley's physician eventually cleared her to return to work as of November 15, 2010. In the interim she hired a lawyer to represent her for a possible civil action against Merle Norman. Beginning on November 13, Kelley's lawyer had an email exchange with counsel for Merle Norman concerning certain assurances Kelley wanted before she returned. Merle Norman characterized this as the imposition of unreasonable conditions and therefore terminated Kelley's employment.

Kelley applied for unemployment benefits, but Merle Norman contended she was ineligible for those benefits under the seldom-used "constructive voluntary quit" doctrine because Kelley insisted on conditions that Merle Norman had no obligation to satisfy, making it impossible to take Kelley back. The state's Employment Development Department (EDD) agreed and denied her claim for benefits. That decision was reversed on appeal to an administrative law judge. The California Unemployment Insurance Appeals Board (the Board) disagreed, and reinstated the EDD's denial of her claim. Kelley then brought an administrative mandate action, where the trial court found that Kelley had not constructively quit.

2

2. *The email Exchange*

Kelley was medically cleared to return to work as of November 15, 2010. In the months before, counsel for Merle Norman and Kelley had discussed a possible settlement of Kelley's sex harassment claim. On November 13, 2010, Kelley's lawyer – Pam Teren – sent an email to Merle Norman's lawyer – Mike McGuiness. Teren wrote that Kelley was ready and able to return to work on November 15, and reminded McGuiness of her previous request for materials that would help Kelley's transition back to work: (1) a written job description; (2) a written statement of goals and objectives; (3) written confirmation of her job title, duties, pay, and benefits; and (4) the status of her earlier request for vacation during the upcoming Christmas holiday period.

Teren followed up with another email less than 20 minutes later. Teren restated the requests from the previous email, and added another: written confirmation that Kelley would not be subjected to retaliation for her earlier complaints of sex harassment. Teren wrote that Kelley could not continue on unpaid leave and needed to return to work. She asked McGuiness to "[p]lease . . . provide me . . . [or Kelley] the above materials and let me know of any documents or information beyond what has already been provided to expedite Ms. Kelley's return to work." Teren concluded by alerting McGuiness to another concern: she had heard that a Merle Norman executive said she had already found a replacement for Kelley, and that she would make sure Kelley would be dismissed after returning. Teren cautioned that if this were true, it would be further evidence of retaliation. Teren said she raised the issue because she and McGuiness had been sharing information as part of their efforts to settle the matter. Teren was still open to negotiations concerning the threatened civil action, but said again that Kelley could no longer afford to remain on unpaid leave and needed to resume work immediately.

McGuiness replied the next day. He said Merle Norman had gone to great lengths to accommodate Kelley. The company was willing to return her to work and provide her with a supportive environment, but considered the conditions set forth in Kelley's emails to be "unreasonable under the circumstances." For instance, McGuiness wrote, Kelley

3

had been off work for seven months and exhausted all her vacation time. Given the poor economy, the company could not give her more vacation time. As for the other conditions, McGuiness said it would be best if Kelley met with her supervisor upon her return to discuss her job duties and expectations. McGuiness assured Teren that Merle Norman would not retaliate and did not tolerate such behavior. He added that the allegation that the executive made statements about replacing and firing Kelley was false and slanderous. He proposed that Kelley resume work on November 30, 2010, so the company could prepare for her return. Finally, McGuiness said that Merle Norman had already offered Kelley a severance package, but invited Teren to submit a further settlement proposal.

Teren replied to that email on November 17, 2010. She said that Kelley still had almost 100 hours of vacation time left. In the past Merle Norman routinely allowed employees to take vacation during the holidays. If that practice had changed, then Kelley expected to be treated like everyone else and would work through the holidays. If not, and Kelley was being singled out in that regard, such treatment would be further evidence of retaliation by the company. She disagreed that the request to get written confirmation of Kelley's duties and compensation was unreasonable. "I do not understand why Merle Norman cannot provide [this] information immediately. Please either have the company provide this or explain why this cannot be provided promptly." Teren said that Kelley wanted to start November 15 due to her financial difficulties, not November 30 as McGuiness proposed, but offered a compromise start date of November 22. Finally, Teren made a settlement demand of $300,000.

McGuiness replied on November 18. He wrote that Merle Norman had been willing to take Kelley back despite learning of "performance deficiencies" while she was on leave. But then Kelley "imposed conditions on her return to work which I advised you were unacceptable to Merle Norman. In your email to me of November 17, Ms. Kelley continues to insist on conditions for her return to work that Merle Norman already has advised you it is unwilling to meet. In addition to these pre-conditions, your email of November 13 falsely accused [a company executive] of stating that she . . . already had

4

replaced Ms. Kelley and that her return to work would result in dismissal. Under all of the current circumstances, and given that Merle Norman does not agree to the conditions that Ms. Kelley has set for her return to work, Merle Norman considers Ms. Kelley's employment to be terminated as of today, November 18."[1]

3.      *Intermediate Rulings*

The EDD denied Kelley's claim for unemployment benefits because it believed Kelley had set conditions for her return to work that Merle Norman did not meet and that she voluntarily quit when she did not return to work at the end of her medical leave. The administrative law judge hearing the appeal of that decision saw things differently, and found that Merle Norman had fired Kelley for reasons that did not amount to misconduct that disqualified her for unemployment benefits. The Board rejected the administrative law judge's ruling, finding instead that Kelley had been more interested in pursuing a lawsuit against Merle Norman, and chose not to return unless Merle Norman provided a written job description and a guarantee of holiday vacation time, concessions that she had no right to demand.[2]

The trial court found that even though Teren's emails were to some extent posturing for the threatened civil action, those emails contained requests, not ultimatums or conditions. Therefore, she did not place Merle Norman in a position where its only reasonable alternative was to fire her. At a minimum, the company should have waited to see whether Kelley showed up for work on November 30, as it requested. As a result, the trial court found that Kelley did not constructively quit.

---

[1]     The "slanderous statement" component of Merle Norman's decision to terminate Kelley is not at issue on appeal.

[2]     Kelley did not file a written opposition with the Board.

5

# STANDARD OF REVIEW

Using independent review, the trial court examines the record of the administrative proceedings to determine whether the administrative agency's findings are supported by substantial evidence. (*Natkin v. California Unemployment Insurance Appeals Board* (2013) 219 Cal.App.4th 997, 1002.) We will affirm the trial court's findings if *they* are supported by substantial evidence. However, if the evidence is undisputed, we treat it as an issue of law subject to independent review. (*Ibid.*) If facts are undisputed and are subject to reasonable conflicting inferences, we adopt the inferences found by the trial court. (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479.)

To the extent we interpret statutory language or administrative regulations, the rules of statutory construction apply. (*Hoitt v. Dept. of Rehabilitation* (2012) 207 Cal.App.4th 513, 523-524.) Our primary task is to determine the Legislature's intent. We first examine the words used in the statute and give them a plain and commonsense meaning. If the language is clear and unambiguous, there is no need for construction or for resort to indicators of the Legislature's intent. (*Bode v. Los Angeles Metropolitan Medical Center* (2009) 174 Cal.App.4th 1224, 1236-1237.) A statute's literal meaning must be aligned with its purpose. Its meaning may not be determined from a single word or sentence. Instead, the words must be construed in context, and provisions relating to the same subject matter or that are part of the same statutory scheme must be read together and harmonized to the extent possible. (*Ibid.*)

We must select a construction that: best fits the Legislature's apparent intent; promotes instead of defeats the statute's general purpose; and avoids absurd or unintended consequences. (*Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 46.) The statute cannot be construed in a way that would make its provisions void or ineffective, especially if that would frustrate the underlying legislative purpose. (*Ibid.*)

6

**DISCUSSION**

1.    *The Law Governing Eligibility For Unemployment Benefits*

California enacted its unemployment insurance scheme to provide "benefits for persons unemployed through no fault of their own [in order to] reduce involuntary unemployment and the suffering caused thereby to a minimum." (Unemp. Ins. Code, § 100.)[3] Unemployment insurance benefits are a property right. (See *Interstate Brands v. Unemployment Ins. Appeals Board* (1980) 26 Cal.3d 770, 775-776.) The unemployment insurance laws are remedial and therefore must be liberally construed where benefits determinations are concerned. (*Messenger Courier Assn. of Americas v. California Unemployment Ins. Appeals Bd.* (2009) 175 Cal.App.4th 1074, 1094.)

A person is disqualified for unemployment benefits if "he or she left his or her most recent work voluntarily without good cause or . . . has been discharged for misconduct connected with his or her most recent work. [¶] An individual is presumed to have been discharged for reasons other than misconduct in connection with his or her work and not to have voluntarily left his or her work without good cause unless his or her employer has given written notice to the contrary to the [EDD] as provided in Section 1327, setting forth facts sufficient to overcome the presumption . . . [which] . . . is rebuttable." (§ 1256.)[4] This presumption applies at each stage of the proceedings, from the EDD's initial eligibility determination through a superior court administrative mandate action. (*O'Connell v. Unemployment Ins. Appeals Bd.* (1983) 149 Cal.App.3d 54, 58-59.) In order to overcome this presumption, the employer must prove by a

---

**3**    All further undesignated section references are to the Unemployment Insurance Code.

**4**    Under section 1327, an employer disputing a former employee's eligibility for unemployment insurance benefits must supply facts supporting the claim of ineligibility within 10 days after notice of the employee's benefits claim was mailed. The Board's decision that found Kelley was ineligible for benefits stated that Merle Norman had complied with this requirement, and on appeal Kelley does not contend otherwise.

7

preponderance of the evidence that the claimant quit without good cause or was fired for misconduct. (*Perales v. Department of Human Resources Dev.* (1973) 32 Cal.App.3d 332, 340-341.)

Under the Unemployment Insurance Code the director of the EDD has the authority to adopt regulations for the administration of the EDD's functions, or that are reasonably necessary to enforce his own functions. (§§ 305, 306.) Effective May 1980 the EDD adopted a regulation that defines when a voluntary leaving of work occurs under section 1256. (Cal. Code Regs., tit. 22, § 1256-1.)[5] Regulation 1256-1 "relates to a voluntary leaving of work within the meaning of Section 1256 of the code and contrasts it with those situations in which an individual leaves work involuntarily as the result of a discharge, a layoff, a disciplinary suspension or any other cessation of employment." (Regulation 1256-1(a).)

An employee voluntarily leaves work when the employee "is the moving party causing his or her unemployment." (Regulation 1256-1(b).) An employee involuntarily leaves work "when the employer is the moving party in causing the unemployment of an employee at a time when the employee is able and willing to continue working." (Regulation 1256-1(c).) Whether an employee leaves voluntarily or involuntarily depends on which party initiated the termination of employment. (Regulation 1256-1(d).)

Under Regulation 1256-1(f), an employee who is discharged may be deemed to have voluntarily quit. Under the heading "Constructive Voluntary Leaving" that section provides: "In some cases, the employee is deemed to have left work voluntarily even though the apparent cause of termination is the employee's discharge by the employer. Such a leaving is a constructive voluntary leaving and it occurs when an employee becomes the moving party by engaging in a voluntary act or course of conduct which leaves the employer no reasonable alternative but to discharge the employee and which

---

[5]    We refer to this as Regulation 1256-1.

the employee knew or reasonably should have known would result in his or her unemployment."

This is followed by three examples of conduct that would qualify as a constructive voluntary leaving. In the first, a truck driver loses his driver's license due to a drunk driving conviction and the employer discharges him "because [he] is no longer able to continue operating the employer's delivery truck." In the second, an employee refuses to join a labor union, or fails to pay union dues, within the period required by a collective bargaining agreement with the employer. As a result he is discharged "as required by the agreement with the union." In the third, a cannery employee hired to work Monday through Saturday decides after several years for personal reasons that he will no longer work on Saturdays, and he is discharged "due to [his] refusal to work Saturdays."

2.      *The Evidence Shows That Kelley Did Not Constructively Quit*

Merle Norman contends that we should exercise independent review of the facts because as a matter of law the emails from Kelley's lawyer constituted unreasonable demands or ultimatums that left it no reasonable alternative but to discharge her. As a result, according to the company, she constructively quit. To support this contention it relies on Regulation 1256-1 and a trio of reported decisions that predate enactment of that regulation. As set forth below, we conclude that the evidence was very much in dispute and was sufficient to support the trial court's judgment. We begin with Regulation 1256-1.

Although we extend some deference to administrative regulations adopted to interpret or implement a statute, the ultimate responsibility for interpreting a statute lies with us. (*Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 436.) Because we have not found or been provided with any administrative interpretations of Regulation 1256-1, we interpret it under the ordinary rules of statutory construction. (*Manriquez v. Gourley* (2003) 105 Cal.App.4th 1227, 1235.)

Under Regulation 1256-1, an employee is deemed to have quit "by engaging in a voluntary act or course of conduct which leaves the employer no reasonable alternative

9

but to discharge the employee . . . ."[6] The three examples given with this regulation involve widely differing scenarios: a truck driver who loses his driver's license, an employee who refuses to join a union or pay his union dues, and a cannery worker on a Monday through Saturday schedule who suddenly refuses to work on Saturdays. The common thread that runs through each example is clarity of meaning and certainty of effect: the actions of the first two made it actually impossible for them to continue working at all, while the worker in the third example actually refused to show up for work one-sixth of the time.

By contrast, this case is, at most, rife with ambiguity about the meaning of the emails from Kelley's lawyer. Teren's emails never used the terms "demands" or "conditions". Instead, she referred to the items she wanted as requests and at no time said that Kelley would not return to work if Merle Norman did not comply. In fact, Teren made it clear that Kelley was having financial difficulties and needed to return to work as soon as possible, and it was McGuiness who proposed a later start date. Merle Norman fired Kelley without ever having asked whether she would refuse to show up for work unless the information was provided.

We believe this set of facts supports the trial court's findings that Kelley's requests were not conditions or ultimatums and that Merle Norman had a reasonable alternative to firing Kelley: it could have waited to see whether she reported for work after the company declined to provide the requested information. As just mentioned, the evidence suggests yet another alternative – Merle Norman could have *asked* whether Kelley would report for work despite the company's refusal to supply the information.[7] In short, even if the emails amounted to some form of pre-litigation poker, Merle Norman

---

**6** Neither the parties nor any of the various adjudicatory bodies to consider this matter have focused on the second half of this sentence: that the employee knew or should have known that his actions would leave the employer no reasonable alternative to firing him.

**7** We express no opinion on whether Kelley's requests were reasonable or not.

could not simply declare itself the winner – it had to call and see whether Kelley was bluffing.

Our interpretation of the evidence is consistent with the express legislative policies behind the unemployment compensation laws and the presumption that an employee was either discharged in the absence of misconduct or quit with good cause. It is also consistent with the three reported decisions cited by Merle Norman.

As noted, these decisions pre-date the adoption of Regulation 1256-1. The first is *Evenson v. Unemployment Ins. Appeals Bd.* (1976) 62 Cal.App.3d 1005 (*Evenson*). The unemployment claimant in *Evenson* was fired from his job after he refused to pay union dues, as required by a collective bargaining agreement. The *Evenson* court interpreted section 1256 to mean that a claimant was ineligible for benefits if he was at fault in causing his unemployment. (*Id.* at p. 1016.) Because the claimant chose not to pay dues after receiving two warnings, his choice was the direct cause of his unemployment, meaning he left work voluntarily. (*Ibid.*) The court concluded that there was not good cause for this decision, making him ineligible for benefits. The doctrine of "constructive voluntary quit" was not mentioned, but the *Evenson* holding is in accord with its principles.

The facts in *Evenson* match those of the second example provided by Regulation 1256-1. As already discussed, that fact pattern does not apply here because Teren's emails did not contain ultimatums or conditions and because an employee who chooses not to pay union dues has committed an act that unambiguously makes it impossible for the employer to retain him.[8]

The second decision is *Douglas v. Unemployment Ins. Appeals Bd.* (1976) 63 Cal.App.3d 110 (*Douglas*). The claimant in *Douglas* requested a three-month leave of

---

[8]     We assume that the *Evenson* decision factored into the drafting of Regulation 1256-1. The same is true of *Hildebrand v. Unemployment Ins. Appeals Bd.* (1977) 19 Cal.3d 765, which reversed a judgment that awarded unemployment benefits to an employee of a vegetable packing company who was fired after refusing to work anymore on Saturdays. The employee had worked a Monday through Saturday schedule for some time despite knowing that her religious beliefs prohibited working on Saturdays.

11

absence in order to accompany her husband out of state to his new job. The employer said she could leave, but did not promise she could return. Instead, the employer said it would take her back only if her replacement did not work out. The *Douglas* court affirmed the trial court's judgment upholding the denial of unemployment benefits because, by taking a leave of absence without assurance that her job would be available upon her return, the employee voluntarily quit without good cause under section 1256. (*Id.* at pp. 116-120.) That fact pattern is also inapplicable here.

The third decision is *Steinberg v. Unemployment Ins. Appeals Bd.* (1978) 87 Cal.App.3d 582 (*Steinberg*). The claimant in *Steinberg* was a clerk-typist who chose not to speak to her co-workers because she did not get along with them. She was fired after disobeying the employer's order to speak to a complaining co-worker. The *Steinberg* court reversed a judgment that affirmed the administrative denial of her unemployment benefits. *Steinberg* is the only reported decision to employ the term "constructive voluntary quit," deriving the term from an eligibility rule contained in an EDD benefit determination guide. (*Id.* at p. 585.)

The rule applied to a claimant who "set in motion the chain of events which resulted in the employer's having no choice except to terminate him." Three requirements had to be satisfied to invoke it: (1) the claimant voluntarily committed some act; (2) that act made it impossible for the employer to utilize his services; and (3) the claimant knew or reasonably should have known the act would jeopardize his job and possibly result in his termination. (*Steinberg, supra,* 87 Cal.App.3d at p. 585.)

Prior decisions had declared employees ineligible for benefits under section 1256 when they were fired for refusing to carry out an employer's reasonable orders, the *Steinberg* court noted. (*Steinberg, supra,* 87 Cal.App.3d at p. 586.) The *Steinberg* court said that the constructive voluntary quit doctrine was simply an additional permutation of section 1256. "It is the voluntary placing of oneself outside the employable sphere which determines whether the person has constructively voluntary quit." (*Id.* at pp. 586-587.) Because there was insufficient evidence that the claimant's silent treatment of her co-workers violated some condition of her employment or had a negative effect on the

12

company as a whole, the court concluded that the employee's order to speak was not reasonable. As a result, no constructive voluntary quit could be found. (*Id.* at p. 587.)

Even if the *Steinberg* court had held that a constructive voluntary quit occurred because the employer's order to speak was reasonable, we would still find that decision inapplicable. There is no evidence that Kelley refused any reasonable order to return to work without the information she sought, because no such order was given. To sum up, the constructive voluntary quit doctrine requires the employer to overcome a rebuttable presumption against a finding of constructive quit. This can only be done by substantial evidence that an employee took some action that actually prevented the employer from retaining the employee, or made some unequivocal demand as a condition to his continued employment that the employer had no obligation to meet and that the employee reasonably knew would result in termination. The doctrine does not apply to those situations in which the employee makes requests or inquiries about employment matters, even though the employer may consider such speech irritating or ungracious.

## DISPOSITION

The judgment is affirmed. Respondent shall recover her appellate costs.


RUBIN, J.

WE CONCUR:



BIGELOW, P. J.



GRIMES, J.

13