Filed 10/11/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| REENA JOHAR,<br><br>    Plaintiff and Appellant,<br><br>             v.<br><br>CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD et al.,<br><br>    Defendants and Respondents. | A162563<br><br>(Alameda County Super. Ct. No. HG20073074)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING; CHANGE IN JUDGMENT** |

THE COURT[*]:

The petition for rehearing filed by appellant Reena Johar is denied, subject to the following modification of the opinion filed in this appeal on September 13, 2022:

1. On page 20, in the first full paragraph, in the fourth sentence which begins, "Under this procedure, . . ." insert "a" before the phrase "claim with the EDD" so that the sentence reads:

> Under this procedure, within 10 days of mailed notice that a former employee has filed a claim with the EDD for unemployment, section 1327 requires the employer to submit "any facts then known that may affect the claimant's eligibility for benefits, including, but not limited to, facts pertaining to eligibility under Section 1256."

---

[*] Pollak, P. J., Streeter, J., Brown, J.

2. On page 33, in the partial paragraph at the top of the page, after the last sentence which ends, ". . . had the EDD correctly overruled SWS's protest of her unemployment insurance claim." insert, continuing in the same paragraph, the following sentence:

> The same principle entitles her to 10 percent prejudgment interest on the amount erroneously recouped from her.

3. On page 33, in the Disposition paragraph, at the end of the second sentence which ends with the citation, "(*Brown, supra,* 20 Cal.App.5th at pp. 1114–1115)," add the phrase, "and on the amount erroneously recouped from her" so that the sentence reads:

> On remand, the trial court shall calculate the amount of the benefits Johar would have been entitled to receive had the EDD not erroneously ruled that she is disqualified from receiving benefits under section 1256 (*Robles v. Employment Development Dept., supra*, 236 Cal.App.4th at pp. 547, 549), plus prejudgment interest on that amount (*Brown, supra*, 20 Cal.App.5th at pp. 1114–1115), and on the amount erroneously recouped from her.

4. On page 33, in the Disposition paragraph, in the fourth sentence, after the phrase, "(2) direct the EDD to pay Johar the amount of benefits she was erroneously denied" insert the phrase "as well as the amount erroneously recouped from her," so that the sentence reads:

> The writ shall (1) direct the CUIAB to vacate its decisions in case Nos. AO-442067, AO-442068 and AO-442069, and (2) direct the EDD to pay Johar the amount of benefits she was erroneously denied as well as the amount erroneously recouped from her, plus prejudgment interest thereon.

The modifications effect a change in the judgment.

Dated:  October 11, 2022                                     STREETER, J.

2

Trial Court:   Superior Court of California, County of Alameda

Trial Judge:   Hon. Michael M. Markman

Counsel:        Garfinkle Law Office, Gary S. Garfinkle and Maria J. Garfinkle, for Plaintiff and Appellant.

Rob Bonta, Attorney General, Cheryl L. Feiner, Senior Assistant Attorney General, Gregory D. Brown, Jennifer G. Perkell, Supervising Deputy Attorneys General, Julia A. Clayton, Ricardo Enriquez, Deputy Attorneys General, for Respondents.

Filed 9/13/22 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| REENA JOHAR,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD et al.,<br><br>    Defendants and Respondents. | A162563<br><br>(Alameda County Super. Ct. No. HG20073074) |

This appeal requires us to address the circumstances when an employee who leaves work to care for a sick family member may be deemed to have "left . . . her most recent work voluntarily without good cause," thus disqualifying her from unemployment benefits under section 1256 of the Unemployment Insurance Code.[1]

Briefly stated, the facts are these. With the agreement of her supervisor, Reena Johar, a home improvement salesperson, left work to care for a terminally ill relative, and while she was away her employer decided she had quit. She was gone about a week. Upon her return, the employer told her business was slow and gave her no new sales appointments. Johar eventually made a claim for unemployment benefits with the Employment

---

[1] All undesignated statutory references are to the Unemployment Insurance Code.

Development Department (EDD), telling the EDD she lost her job due to a "temporary layoff."

The employer denied laying Johar off. While conceding that she left with her supervisor's approval, the employer advised the EDD that Johar's failure to provide a return date or otherwise communicate with her supervisor while she was away amounted to a voluntary quit. The EDD accepted the employer's position, found Johar ineligible for unemployment benefits, ordered reimbursement of benefits improperly paid, and imposed a penalty for willful misrepresentation in seeking benefits. An administrative law judge (ALJ) sustained the EDD's ruling, and the California Unemployment Insurance Appeals Board (CUIAB) affirmed, finding that "Basically, [Johar] abandoned her job."

Johar sought review in superior court by administrative mandamus petition. In response to the petition, the CUIAB confessed error for failing to consider new evidence discovered by Johar while the administrative appeal was pending. It requested a remand so the case could be reconsidered, and it acknowledged that Johar's new evidence may lead to a decision in her favor. At the CUIAB's invitation, the court dismissed the case without reaching the merits and remanded for further administrative proceedings. This appeal followed.

We will reverse. We conclude Johar was entitled to mandate relief on the existing administrative record. It is undisputed that she left her job in emergency circumstances with the employer's approval, and thus for good cause. The question is what to make of the circumstances after her departure. In assessing that question, we ask who the moving party was in terminating the employment relationship, bearing in mind that an employee who leaves work for good cause is entitled to a presumption that she has not

2

voluntarily quit.  The presumption may be overcome, but only upon evidence showing the employee positively repudiated her obligation to return in clear terms.  The evidence here does not meet that standard.

# I. BACKGROUND

## A. *Factual Backdrop, Submission of Claim to EDD, and EDD's Ineligibility, Reimbursement, and Penalty Determinations*

Success Water Systems (SWS) sells water filtration equipment to residential customers under the brand name "EcoWater."  Its sales referrals come from Costco and are for Costco members.  Johar worked for SWS as a sales representative beginning in April 2019.  Her job was to visit the homes of prospective customers, demonstrate the use of SWS's products using a "company test kit" and solicit sales on-site.  After these visits, she fielded follow-up questions from sales prospects, and helped with preparation of the necessary order forms and related documentation once they decided to buy.

Johar's base pay was approximately $1,200 per month, paid twice monthly and calculated at a per diem rate, but the bulk of her compensation was in the form of commissions for completed sales, so she needed a continuing stream of work assignments in order to earn her full pay.  Work assignments came from SWS schedulers, who dispatched her to sales appointments.  Johar reported to Mari Lynn Johnson, an SWS Sales Manager.  Carol Johnson was in charge of issuing checks for commissions and semi-monthly per diem payments.[2]

Shortly after Johar began working for SWS, in May of 2019, she took an approved leave of absence to go to Chicago to assist her grandmother, who was terminally ill.  She was gone "about a week and a half."  According to Johar, she was hired with the understanding that she might need to take

_____

[2] Mari Lynn Johnson is Carol Johnson's daughter.

3

leaves from time to time to care for her grandmother.  With Mari Lynn Johnson's "full support," on October 23, 2019, Johar went out on another leave of absence to care for her grandmother.  Upon returning in early November, she received no further sales appointments for many weeks and was told business was "slow."

Johar believed her employment with SWS was "ongoing," since considerable time sometimes passed between sales appointments.  But she was not sure.  SWS had taken some steps that suggested her employment was over—such as sending her a "final check" and asking for her test kit back—but had not followed through by telling her to stop communicating with prospective SWS customers she solicited before going to Chicago, paying her everything she was owed in commissions, or giving her directions about where to return her test kit.

Eventually, on February 2, 2020, having received no further sales appointments by the end of January, Johar filed a claim for unemployment benefits with the EDD.  She listed the reason for her loss of employment with SWS as a "temporary layoff."  EDD initially paid unemployment benefits for three weeks at $450, and notified SWS of Johar's claim.  Carol Johnson replied to EDD's notice of claim for SWS under section 1327 by checking a "Voluntary Quit" box on the form for employer reply.

A brief investigation by EDD followed.  An EDD investigator interviewed Johar and Carol Johnson.  Johar told the EDD interviewer that she "requested family emergency leave on 102019" from Mari Lynn Johnson, expected to be gone three weeks, and was advised by Mari Lynn Johnson that "she can return at any time she is able and will still have her job."

The version of events given to the EDD interviewer by Carol Johnson differed, but not as to whether Johar left with SWS's approval.  She

acknowledged that Johar "had an agreement with" Mari Lynn Johnson to go to Chicago, but stated that the approved leave was not indefinite. According to Carol Johnson, Johar failed to respond to repeated requests for a return date, and was eventually deemed absent without leave. As shown on the summary of interview form, Johar's "date of separation" was October 31, 2019—which marked the end of her employment, from SWS's perspective—and the reason for her separation was "v[oluntary] q[uit]."

After completing its interviews, the EDD ruled against Johar and relieved SWS of any charges to its unemployment reserve account under section 1032. In its notice of determination, the EDD viewed Johar's departure for Chicago as an approved absence, but accepted SWS's position that she overstayed her leave, failed to communicate with her supervisor while gone, and failed to take steps to preserve her employment upon her return.

Under section 1256, the EDD ruled that Johar was disqualified from receiving unemployment benefits for her loss of employment with SWS, and under section 1257, subdivision (a), she was docked $2,250 from any future unemployment insurance claims made within three years. In a separate ruling, the EDD found that Johar willfully gave false information or withheld information to explain her job loss. Under sections 1375 and 1375.1, respectively, the EDD ordered Johar to reimburse overpaid benefits of $1,350 and to pay a 30 percent penalty ($405), for a total of $1,755.

**B.** *Proceedings Before the CUIAB*

Johar filed a handwritten pro se appeal of these adverse EDD decisions with the CUIAB, and the CUIAB assigned the appeal for initial consideration to an ALJ, who held a brief evidentiary hearing by telephone. Johar appeared and testified for herself. Mari Lynn Johnson, Carol Johnson, and Lloyd Stack, SWS's general manager, appeared for SWS; and the two

5

Johnsons gave substantive testimony. Each side tendered packages of documentary exhibits, mostly copies of electronic communications between Johar and her managers and coworkers at SWS in the timeframe September 2019 to early February 2020. Except for a few of SWS's proffered exhibits that Johar had no opportunity to review before the hearing, these exhibits were admitted into evidence without objection.

### 1. Witness Testimony in the ALJ Hearing

The witness testimony in the ALJ hearing aligned with the positions taken before the EDD.

Mari Lynn Johnson admitted she was "in full support of [Johar] going and taking care of her grandmother." There was no evidence that Mari Lynn Johnson conditioned Johar's leave on a specific return date; she testified, "I just had figured she'd be coming back." Mari Lynn Johnson acknowledged that there was never any formal "separation" of Johar from SWS. She maintained, however, that after leaving, Johar failed to reply to repeated requests from her for a specific return date. Carol Johnson testified to the same series of events, and added that she sent a "final check" on November 5.

In her testimony, Mari Lynn Johnson supplied a new detail that had not been provided to the EDD. She explained to the ALJ that, as a Costco vendor, SWS is a licensed home improvement contractor, that SWS's sales representatives, too, must be "licensed,"[3] and that, in the Fall of 2019,

---

[3] A "home improvement contractor" must be licensed by the Contractors State License Board (CSLB) (Bus. & Prof. Code, § 7150.1) and a "salesperson" employed by a "home improvement contractor[]" must be registered with the CSLB (*id.*, § 7153.1). Both the contractor and the salesperson are subject to discipline for noncompliance with these regulatory requirements. (Bus. & Prof. Code, § 7154, subds. (c), (d) [contractor]; *id.*, § 7155 [salesperson].) An applicant for a home improvement salesperson registration must submit a set

6

"Reena's application was pending," "we only had so many more days to . . . get her license,"[4] and eventually the application "was declined because they didn't get the information by a certain time." "So even if" Johar had come back from Chicago and notified SWS of her readiness to work, Mari Lynn Johnson testified, "she's not licensed . . ." and was ineligible to work.

Johar denied quitting. She testified that she was dealing with a "family emergency," that Mari Lynn Johnson and Carol Johnson were "well aware" of her reason for needing time off, that she was back from Chicago "within a week," and that, while she was away, she continued to field customer inquiries and was "in touch with" Mari Lynn Johnson and others at SWS. She also testified to her understanding SWS had "employed another person," which is what Mari Lynn Johnson told her in a text on October 23, 2019, though she did not know what that meant for her own status.

Johar testified that while in Chicago, and indeed until early February 2020 after her return, she was still fielding follow-up inquiries from prospective SWS customers and was never given directions about returning her test kit. She also testified that SWS still owed her a considerable amount of commission money. When pressed by the ALJ why she did not contact

---

of fingerprints to the CSLB so that it may conduct a criminal history record check. (*Id.*, § 7153.1, subd. (c).)

[4] Among the documentary exhibits proffered by SWS, and made part of the administrative record, is Johar's application for registration as a home improvement salesperson. The testimony concerning this application, both from Mari Lynn Johnson and from Johar, describes it as a "license" application. SWS paid the $83 fee for the application on October 4, 2019. Six days later, the CSLB sent a notice to SWS acknowledging receipt of the application and indicating that a set of fingerprints from Johar must be provided within 90 days. There is no evidence in the record that SWS passed on to Johar the CSLB's request for fingerprints or otherwise advised her that the application was incomplete.

Mari Lynn Johnson to clarify her status following Carol Johnson's email telling her to expect a "final check," Johar testified that, upon returning from Chicago, Mari Lynn Johnson "blocked" her incoming calls and emails. Johar also testified that she called Carol Johnson twice, once in mid-November, once in December, and tried to email her as well. But no one would give her a clear explanation of her status. Essentially, Johar testified to being left in a state of limbo. "They're not telling me anything . . . . I kept telling them, when do I come and work." "Got no reply."

As for the matter of a pending "license" application and Mari Lynn Johnson's suggestion that Johar failed to provide necessary information to complete it, Johar testified that she submitted the application "through" SWS, that SWS was handling it, that she was never told the application was incomplete, and that she had no idea it had been denied until she saw in SWS's proposed exhibits prior to the ALJ hearing an official notice of denial, dated February 7, 2020, five days after she applied for unemployment benefits.

## 2. Documentary Evidence in the ALJ Hearing

The trail of electronic communications revealed by the documentary exhibits added some additional contextual detail. None of this was disputed.

The immediate lead-up to Johar's departure for Chicago began with an exchange of texts between Johar and Mari Lynn Johnson on October 22, 2019. Before leaving, Johar confirmed by text to Mari Lynn Johnson that she made arrangements to drop off a customer contract at SWS's office on "Tue[sday]."[5] In this text, she also commented that "thurs is granny time at the hospital." Then, on the morning of October 22, in a text exchange with

---

[5] We take judicial notice on our own motion that October 22, 2019, was a Tuesday. (Evid. Code, § 452, subds. (g), (h).)

8

Mari Lynn Johnson at 10:14 a.m., Johar confirmed she was still intending to meet customers that afternoon. Later that day, Johar told Mari Lynn she needed to reschedule two afternoon customer appointments, explaining that "I am worked up with my grandmother's health right now."

According to Johar, one of the customers was very accommodating of her need to reschedule, but the SWS scheduler "had an attitude" about Johar's failure to advise the second customer ahead of time she would not be showing up that day. A complaint in connection with one of these cancelled appointments, made by a couple named "Shah," apparently followed. Johar and Mari Lynn Johnson exchanged texts about this complaint on the evening of October 22: "[Mari Lynn Johnson, 8:18 p.m. October 22]: I spoke to mr and mrs shah after they called Costco tonight. We need to talk tomorrow. [Johar, 12:02 a.m. October 23]: [F]or now I want to concentrate on my grandmother so I am going to take a mini break i don't want any controversy [¶] I have worked sincerely till now [¶] We will talk about this episode."

On the day Johar left, October 23, Mari Lynn Johnson texted Johar as follows: "Please bring in your test kit and book. [¶] I hired don a new salesman started yesterday. [¶] The kit is $500 so to keep from being charged back for it I'll need it [¶] I will stop payroll for you as of yesterday. Best wishes to your Grandmother. I'm not mad at you so no controversy at all. . . . No episode to talk about[,] they're all smoothed over." And on the evening of October 23, she sent another text, "Are you getting my voicemails? I need to hear from you by tomorrow with some sort of plan to return. When will you be back? We need to make schedules. What does mini-vacation mean?" Johar did not reply to either of these texts, at least not right away.

Over the following week, while Johar was in Chicago, Mari Lynn Johnson sent Johar several emails complaining about Johar not replying to

texts and phone messages and raising questions about problems with "paperwork" for customer orders solicited by Johar before she left. Johar responded that she could not reply to work communications while in the hospital with her grandmother. She said, "I am in chicago as you know and am on a family emergency. Surely you have had some in your life. IT IS NOT A VACATION. You were duly informed not only on day one but consistently. I will do what needs to be done for my family. Will get back to you when the emergency ceases."

Although Johar did not provide a specific return date, while in Chicago she did engage in extensive email communication with Mari Lynn Johnson and others at SWS in response to the questions raised about customer "paperwork." And the emails grew increasingly testy. Johar took the position the "paperwork" problems were not her fault and accused Mari Lynn Johnson of making misstatements. Mari Lynn Johnson and another manager at SWS disagreed. The email debate over who was to blame for customer "paperwork" problems ended on October 29, with Mari Lynn Johnson saying that neither she nor anyone else at SWS would respond to any more emails from Johar. She wrote, "Until you and I speak with Lloyd present there will be no more dialogue. Many of your statements are not fact . . . . [¶] . . . [¶] No other emails will be replied to from me or Success-water team members until we meet."

Johar persisted, attempting to engage further by email on October 30. Mari Lynn Johnson sent a final response the same day, October 30, escalating the confrontational tone of the dialogue. Claiming at first that she did not know who Johar's October 30 email came from, Mari Lynn Johnson wrote, "If it's you [R]eena, I will file a harassment claim against you. I've already contacted our attorney. [¶] Please cease and desist your badgering of

me. [¶] . . . Costco requires all consultants to be finger printed and licensed to be on any members property.  Feel free to tell them who you are.  Especially as we had the shah family file a complaint against you.  That was the second one. [¶] As of now, you do not qualify. [¶] Please stop.  We're done here.  It's not productive."[6]

Five days later, on November 4, Carol Johnson wrote an email to Johar stating as follows:  "I understand you are presently in Chicago caring for your Grandmother. . . . [¶] With that being the case[,] you are unable to work. . . . To be considerate of your position, we are paying you for the full pay period as paid sick time which is much over your earned time.  I am also paying you vacation earned to date. [¶] . . . [¶] We are paying you [commissions] for everything installed to date and also those scheduled to be installed."

---

[6] This was not the first time Mari Lynn Johnson had ended an email dialogue with Johar in a tone of angry exasperation.  Weeks before Johar left for Chicago, on September 25, she wrote an email to Mari Lynn Johnson accusing Lloyd Stack and someone named "Joseph," Mari Lynn Johnson's assistant, of yelling at her and criticizing her English-speaking abilities.  Johar, who is of Indian descent, accused these two of racial discrimination.  She also levelled this accusation at Mari Lynn Johnson.  Evincing a tone of irritation, Mari Lynn Johnson's email reply to Johar, also dated September 25, raised a question about Johar's "future" on the sales team.  She wrote:  "Its time to stop!  Joseph is my assistant and he is there to help when I'm not available. . . . I'm done with arguing about your lack of understanding of this job. [¶] . . . If I hear one more thing from you about people treating you wrong (which is not true) then we're all done here! [¶] First it's Lloyd you complain about as well as everyone in the company who tries to help you. [¶] I resent this email and [t]omorrow I'll speak with Lloyd and make a decision on the future with you on the team. [¶] I will not be lead [*sic*] into saying something that you can use against me and my company. [¶] I'm done with this!!!!"

11

### 3. The ALJ's Decisions

The ALJ upheld the EDD's prior determinations that Johar was ineligible for unemployment benefits, that she owed reimbursement for improperly paid benefits, that she was liable for penalties, and that SWS's reserve account would not be charged. But on the key issue of disqualification for benefits under section 1256, the ALJ's rationale varied slightly from the reasoning employed by the EDD.

The EDD found that Johar left on an approved leave of absence and thereafter failed to take steps to preserve the employment relationship by communicating a date for her return, but the ALJ found "there is no evidence to show [Johar] requested a leave of absence or took steps to preserve the employment relationship" by notifying her employer of a specific return date and advising it of her availability for work. Thus, while the EDD found that Johar left with Mari Lynn Johnson's blessing—which was admitted in the section 1327 response Carol Johnson provided to the EDD—and abandoned her job thereafter, the ALJ instead found that Johar never sought approval for her leave in the first place.

### 4. The CUIAB Appeal

Johar appealed the ALJ's merits, reimbursement and penalty decisions to the CUIAB, initially still in pro per. To assist her in the pursuit of her appeal, she secured representation from the Workers' Rights Clinic, one of the Community Justice Clinics affiliated with the University of California Hastings College of the Law (the Clinic, or the Hastings Clinic). Along with a challenge to the ALJ's determination that Johar voluntarily quit, the Clinic proffered some new evidence that had not been available at the time of the ALJ hearing.

According to the Clinic, this new evidence showed that SWS had altered Johar's application for registration with the CSLB by, allegedly,

12

changing the address she listed for herself from her home address in Fremont to SWS's business address in Brentwood. Because of the change of address on the application, the Clinic argued, Johar was prevented from finding out that the CSLB had given notice that her home improvement salesperson registration application was incomplete. The theory advanced by the Clinic was this: If Johar was "unlicensed," SWS had arranged to ensure that was the case, which made SWS, not Johar, the moving party in ending the employer-employee relationship.

The CUIAB rejected Johar's appeal, reasoning as follows: "The claimant [Johar] left for Chicago to take care of a sick family member on October 23, 2019. The claimant had made such trips in the past but had reported back to work after a week or so. When the claimant left for the final time, the claimant did not give a definite return date nor did the claimant ask for a leave of absence. . . . [¶] The evidence is such that the claimant left indicating she would be on a mini vacation taking care of a sick relative, and then never returned to work nor made any attempt to contact the employer. Basically, the claimant abandoned her job."

In essence, the CUIAB adopted the reasoning of the ALJ, but it went further. "There is no evidence," the CUIAB found, that "the claimant made any attempts to contact the employer in the period between her last day of work and her applying for benefits." The CUIAB was also unmoved by the newly discovered evidence proffered by the Hastings Clinic. It explained, "We do not think that the additional evidence is relevant. More importantly, we have not considered the information because the parties would not be able to exercise their due process right to review and rebut the evidence, and the administrative law judge would not have the opportunity to hear and weigh all the evidence and assess credibility." Without any explanation specific to

13

whether Johar willfully made false statements or withheld information to obtain benefits, the CUIAB determined that "[t]he decisions of the administrative law judge are affirmed."

Three days after the CUIAB issued its decision denying Johar's appeal and refusing to consider the new evidence she proffered, Division One of this court filed its opinion in *Land v. California Unemployment Insurance Appeals Board* (2020) 54 Cal.App.5th 127 (*Land*).[7] In that case, an unemployment insurance claimant appealed an adverse ALJ determination and submitted new evidence that he contended fundamentally undermined the ALJ's decision (*id*. at p. 143), just as Johar did here. And the CUIAB, just as it did here, refused to consider the new evidence, citing due process concerns. (*Ibid*.) The *Land* court viewed the proffered new evidence there to be "pivotal" (*id*. at p. 144) and vacated the CUIAB's affirmance of the ALJ's decisions. The court remanded with directions that the CUIAB either take the new evidence into account directly, or remand to the ALJ to "make new findings of fact" and issue "new reasons for decision" "in light of such evidence." (*Id*. at p. 146.)

In September 2020, Johar filed this administrative mandamus proceeding seeking writ review of the CUIAB's affirmance of the ALJ. In response, the Board agreed that the new evidence Johar presented to the CUIAB was "arguably relevant" in light of *Land* and took the position that the court should vacate the CUIAB's affirmance and remand for further administrative proceedings so that the new evidence could be considered. That was the best resolution of the matter, the CUIAB argued, because further factfinding may result in a decision favoring Johar.

---

[7] *Land* was initially filed as an unpublished opinion, but was later ordered published.

14

The superior court agreed.  Without ruling on the merits, the court entered judgment for Johar, vacated the CUIAB's affirmance of the ALJ, and remanded for further proceedings in light of *Land*.  Johar then moved to set aside the judgment in her favor.  She contended, among other things, that the court incorrectly concluded a remand for further administrative proceedings was the "only appropriate remedy" for the CUIAB's error and that, on the undisputed evidence already of record, mandamus was warranted.  The trial court rejected these arguments, entered a judgment of dismissal, and denied a later motion to vacate the judgment.

This timely appeal is from both the judgment and the denial of the postjudgment motion to set aside the judgment.

## II. DISCUSSION

### A. *Standards of Review*

In administrative mandamus proceedings under Code of Civil Procedure section 1094.5, the governing standards of review are well established.  "Using independent review, the trial court examines the record of the administrative proceedings to determine whether the administrative agency's findings are supported by substantial evidence." (*Kelley v. California Unemployment Ins. Appeals Bd.* (2014) 223 Cal.App.4th 1067, 1073–1074 (*Kelley*); see *Natkin v. California Unemployment Ins. Appeals Bd.* (2013) 219 Cal.App.4th 997, 1002.)  On appeal, we review the trial court's determinations for substantial evidence, while conducting de novo review where the evidence is undisputed.  "We will affirm the trial court's findings if they are supported by substantial evidence. . . . If facts are undisputed and are subject to reasonable conflicting inferences, we adopt the inferences found by the trial court." (*Kelley*, at p. 1074, italics omitted.)

Because the trial court resolved the writ proceedings in this case on procedural grounds, without making any factual assessments, we will review

15

that decision for abuse of discretion. When reviewing for abuse of discretion, we always conduct independent review of any determinations of law or of the legal premises on which an exercise of discretion is founded. Here, the "evidence taken at the administrative hearing . . . was sparse, incomplete, [and] vulnerable to incompatible interpretations, but not in conflict" (*Lacy v. California Unemployment Ins. Appeals Bd.* (1971) 17 Cal.App.3d 1128, 1133), at least not in any material respect. Because the ultimate issue that we find to be dispositive is one of law—whether Johar was disqualified from entitlement to unemployment benefits under section 1256—our review will be de novo. (*Perales v. Department of Human Resources Dev.* (1973) 32 Cal.App.3d 332, 336 ["Whether an employee has quit his employment without good cause is a question of law."].)

## B. *Analysis*

Had the new evidence proffered by Johar during the pendency of the CUIAB appeal been pivotal to a correct decision, as it was in *Land*, the trial court would have been right to vacate CUIAB's decision and remand these proceedings for further administrative factfinding, given the distinct possibility, acknowledged by the CUIAB, that the decision on remand might be in Johar's favor. We conclude, however, that further administrative proceedings are unnecessary here. Because the CUIAB's decision was incorrect on the administrative record before it, we hold it was an abuse of discretion to withhold mandamus relief pending further administrative proceedings.

In so holding we are mindful of three guiding principles. First, "[t]he fundamental purpose of California's Unemployment Insurance Code is to reduce the hardship of unemployment . . . ." (*Paratransit, Inc. v. Unemployment Ins. Appeals Bd.* (2014) 59 Cal.4th 551, 558 (*Paratransit*).) Toward this end, our Legislature created an "[u]nemployment . . . insurance

16

program . . . [designed to] 'provid[e] benefits for persons unemployed through no fault of their own' . . . [(§ 100)]" (*Gilles v. Department of Human Resources Development* (1974) 11 Cal.3d 313, 316), recognizing that " '[u]nemployment benefits provide cash to a newly unemployed worker' " at a time of great privation, which helps " 'maintain the recipient at subsistence levels without the necessity of his turning to welfare or private charity' " (*id.* at p. 325, quoting *California Human Resources Dept. v. Java* (1971) 402 U.S. 121, 131–132).

Second, remedial statutes involving welfare benefits are to be interpreted in a manner that minimizes the hardship of unemployment. Because unemployment insurance benefits are a property right (*Interstate Brands v. Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 775–776), and because the unemployment insurance laws are remedial in nature (*Messenger Courier Assn. of Americas v. California Unemployment Ins. Appeals Bd.* (2009) 175 Cal.App.4th 1074, 1094), the Unemployment Insurance Code must be "liberally construed to further the legislative objective of reducing the hardship of unemployment" (*Gibson v. Unemployment Ins. Appeals Bd.* (1973) 9 Cal.3d 494, 499; see *Sanchez v. Unemployment Ins. Appeals Bd.* (1984) 36 Cal.3d 575, 584). Third, in the implementation of this humanitarian objective, avoiding needless delay is crucial. That has implications not only for how we interpret section 1256, but for the nature and scope of the remedies we order should we conclude benefits were erroneously denied. " '[T]he prompt payment of benefits is the " 'very essence' " of the unemployment compensation insurance program,' " we held in *Brown v. California Unemployment Ins. Appeals Bd.* (2018) 20 Cal.App.5th 1107, 1114 (*Brown*), and we so hold again here.

### 1. Applicable Principles Under Unemployment Insurance Code Section 1256

A person is disqualified for unemployment benefits under section 1256 if "he or she left his or her most recent work voluntarily without good cause or . . . has been discharged for misconduct connected with his or her most recent work." (§ 1256.) Under implementing regulations promulgated by the EDD (Cal. Code Regs., tit. 22, § 1256-1, subds. (b), (c) (EDD Regulations)), the basic framework of analysis is well established. The threshold issue is whether the employee claimant left work voluntarily or involuntarily. (*Ibid.*) To resolve that issue, section 1256-1 of the EDD Regulations focuses on which party—employer or employee—initiated [the] termination, suspension or cessation of employment. (*Id.*, § 1256-1, subd. (d).)[8]

"An involuntary leaving of work occurs when the employer is the moving party in causing the [employee's] unemployment . . . at a time when the employee is able and willing to continue working." (EDD Regulations, § 1256-1, subd. (c).) "A voluntary leaving of work occurs," on the other hand, "when an employee is the moving party causing his or her unemployment" at a time when "when work is available and the employee leaves work of his or her own free will." (*Id.*, § 1256-1, subds. (b), (d).) The analysis pivots from there, depending on whether the employee left work involuntarily or voluntarily. In an involuntary leaving scenario, the focus is on whether there

---

[8] "Although we extend some deference to administrative regulations adopted to interpret or implement a statute, the ultimate responsibility for interpreting a statute lies with us." (*Kelley*, *supra*, 223 Cal.App.4th at pp. 1076–1077.) Because we have not found or been provided with any pertinent administrative interpretations of EDD Regulations sections 1256-1, 1256-3, and 1256-10—the specific regulatory provisions we apply in this case—we interpret them under the ordinary rules of statutory construction. (*Kelley*, at p. 1077.)

18

was a discharge for misconduct (*id.*, §§ 1256-30–1256-43), while in a voluntary leaving scenario the focus is on whether the employee left for "good cause" (*id.*, §§ 1256-3–1256-23).

"A claimant is not disqualified under Section 1256 of the code if his or her employment is terminated either as the result of a voluntary leaving with good cause or as the result of a discharge or suspension by the employer for reasons other than work-connected misconduct of the claimant." (EDD Regulations, § 1256-1, subd. (a).) No one in this case contends that SWS fired Johar for "work-connected misconduct," so we proceed down the "voluntary leave" branch of section 1256 analysis. "Good cause" exists for voluntarily leaving work, "when a substantial motivating factor in causing the claimant to leave work, at the time of leaving, whether or not work connected, is real, substantial, and compelling and would cause a reasonable person genuinely desirous of retaining employment to leave work under the same circumstances." (EDD Regulations, § 1256-3, subd. (b).)[9] "Generally good

_____

[9] "Good cause may exist for reasons which are personal and not connected to the employment situation [citation], but those reasons must be imperative and compelling in nature." (*Macgregor v. Unemployment Ins. Appeals Bd.* (1984) 37 Cal.3d 205, 209.) The EDD Regulations delineate 21 sets of circumstances constituting "good cause." (See EDD Regulations, §§ 1256.2-1 [deprivation of equal employment opportunities], 1256-4 [apprenticeship training],1256-5 [attendance at school or training course], 1256-6 [conscientious objection], 1256-7 [disciplinary action by employer], 1256-8 [transportation to work], 1256-9 [domestic circumstances, generally], 1256-10 [domestic circumstances involving health, care or welfare of family], 1256-11 [domestic circumstances, minor], 1256-12 [domestic circumstances involving marriage], 1256-13 [equipment], 1256-14 [experience or training], 1256-15 [health, safety or morals], 1256-16 [leave of absence], 1256-17 [pensions and retirement], 1256-18 [personal affairs], 1256-19 [prospects of other work], 1256-20 [time], 1256-21 [union relations], 1256-22 [wages], 1256-23 [working conditions].)

cause for leaving work is decided on the facts at the time the claimant left work." (EDD Regulations, § 1256-3, subd. (b).)

An employer has the right to protest a section 1256 eligibility determination, as SWS did here. (§§ 1327, 1331; EDD Regulations, § 1326-1, subd. (b)(1)(A).) Should such a dispute arise, there is a rebuttable presumption in favor of the employee. "An individual is presumed . . . not to have voluntarily left his or her work without good cause unless his or her employer has given written notice [making a factual showing] to the contrary . . . as provided in Section 1327." (§ 1256.) Under this procedure, within 10 days of mailed notice that a former employee has filed claim with the EDD for unemployment, section 1327 requires the employer to submit "any facts then known that may affect the claimant's eligibility for benefits, including, but not limited to, facts pertaining to eligibility under Section 1256." (§ 1327.) At all stages of the administrative proceedings that follow, as well as on mandamus review, the employer bears the burden of showing by a preponderance of the evidence that these facts overcome the presumption against a voluntary quit. (*O'Connell v. Unemployment Ins. Appeals Bd.* (1983) 149 Cal.App.3d 54, 58; *Perales v. Department of Human Resources Dev.*, *supra*, 32 Cal.App.3d at p. 340.)

### 2. On the Undisputed Evidence of Record There Was a Voluntary Departure from Work for Good Cause

It is undisputed on this record that we have a voluntary departure at a time when work was available. Johar left work in late October 2019 of her own volition and, at least for some period of time after her departure, both parties expected the employment relationship to continue after her return. Discussions about scheduling customer appointments were ongoing just before her departure, and it made no sense for Mari Lynn Johnson to press Johar for a return-to-work date if SWS did not have the expectation she

20

would return, at least initially. Indeed, she testified that was what she expected. And we know that Johar shared the same expectation, given her belief that there was an ongoing employment relationship when she came back from Chicago.

Johar's departure was also indisputably for good cause. If an employee leaves work due to domestic "circumstances relating to the health, care, or welfare of the claimant's family of such a compelling nature as to require the claimant's presence," she has left with "good cause." (EDD Regulations, § 1256-10, subd. (b).) Johar left for Chicago in the belief that "a member of [her] family [was] seriously ill or disabled . . . or . . . in danger of death" (*id.*, subd. (c)(1)), a concern the text communications show Mari Lynn Johnson was aware of and that she acknowledged by stating her full support for Johar's announced intent to depart.

"Prior to leaving work," to be sure, an employee "has a duty to attempt to preserve the employment relationship" and her failure to discharge that duty may "negate[] what would otherwise constitute good cause" for leaving work. (EDD Regulations, § 1256-3, subd. (c) [Duty to Preserve the Employment Relationship].) The ALJ found there was no evidence Johar "requested a leave of absence or took reasonable steps to preserve the employment relationship such as [by] providing the employer with notification of her status and availability for employment *after departure on October 23, 2019*," but to the extent the ALJ relied on post-departure facts here he misconceived the nature of the "good cause" inquiry. Because the issue of "good cause" for a voluntary leave generally turns on the facts at the

21

time the employee departs, the focus of this issue should be on whether the employee took steps to preserve employment prior to leaving.[10]

The duty to take steps to preserve employment was discharged here. There was no evidence that, when Johar left, SWS had an established leave of absence policy which Johar knew or should have known, and simply ignored. And to the extent there was an informal leave protocol established by the parties' prior conduct, Johar followed it. It is undisputed that she had previously notified SWS of the prospect she may need to leave work to attend to her grandmother's health, that SWS had allowed her to take a break for that reason in May 2019—without strings attached—and, having advised Mari Lynn Johnson she was facing the same circumstances again in October 2019, that she secured permission to leave.

Rather than rely on failure to discharge the duty to preserve employment, the CUIAB embraced the ALJ's finding that Johar failed to seek approval of her trip to Chicago, embellishing that finding with plainly inaccurate factual statements about the evidence ("When the claimant left . . . [, she] merely described her leave as a 'mini vacation' "; "There is no evidence the claimant made any attempts to contact the employer in the period between her last day of work and her applying for benefits"). But this approach to analyzing Johar's entitlement to benefits under section 1256 raised another problem: The determination that Johar failed to seek approval for a leave of absence before departing is contrary to the facts SWS *admitted*. Carol Johnson's section 1327 submission on behalf of SWS, sent by way of response to EDD's notice of Johar's claim, stated that Johar left for

---

[10] There was no evidence postdating Johar's departure that called into question whether, *at the time she left*, she was not in fact facing exigent circumstances.

22

Chicago with Mari Lynn Johnson's "agreement," which necessarily means Johar left with her supervisor's knowledge and approval. The presumption against a voluntary quit without cause cannot be overcome based on a finding that contradicts the employer's section 1327 showing of ineligibility.

### 3. *Kelley v. California Unemployment Insurance Appeals Board*

The dispositive question in this case is whether, having voluntarily left work for good cause, Johar manifested an intention to abandon her job while she was gone. Johar claims she did not, citing *Kelley v. California Unemployment Insurance Appeals Board*, *supra*, 223 Cal.App.4th 1067, a case where an employee who filed an administrative charge of sexual harassment took a stress-related leave of absence for six months. When she was medically cleared to return, she requested some workplace accommodations to mitigate her stress. (*Id*. at pp. 1070–1071.) In the midst of a series of lawyer-to-lawyer communications over possible settlement of the employee's harassment claim, the employer took the position that the employee's requests were unreasonable demands, and terminated her. (*Id*. at p. 1071.)

At issue in *Kelley* was whether the employee's requested accommodations transformed the termination, in legal effect, into what the court called "a constructive voluntary quit" (*Kelley*, *supra*, 223 Cal.App.4th at p. 1079), thus rendering her ineligible for benefits under section 1256. (EDD Regulations, § 1256-1, subd. (f) ["In some cases, the employee is deemed to have left work voluntarily even though the apparent cause of termination is the employee's discharge by the employer."].) Reversing the CUIAB in administrative mandamus proceedings, the superior court found there was no constructive voluntary quit, and a Second District panel affirmed. While the analogy to *Kelley* is imperfect—here, the CUIAB found an actual quit, not a constructive voluntary quit, and in *Kelley*, unlike this case, the starting point

23

of analysis was an acknowledged termination by the employer—we agree the case is broadly instructive.

The *Kelley* court considered the evidence offered by the employer to rebut the presumption against a voluntary quit in that case, and found it wanting. The illustrative examples used in the EDD Regulations to show situations amounting to a constructive voluntary quit, the court pointed out, all involve situations where the employer had no reasonable alternative but to terminate the employment relationship because the employee either engaged in conduct that made a return to work impossible or outright refused a directive to return. (*Kelley*, *supra*, 223 Cal.App.4th at pp. 1076–1077; EDD Regulations, § 1256-1, subd. (f), examples 2–4.) The "common thread" in these examples, the court explained, is "clarity of meaning and certainty of effect." (*Kelley*, at p. 1077.) On the evidentiary record presented, the facts did not meet this standard because the emails containing what the employer saw as unreasonable demands were "rife with ambiguity" as to the employee's actual intent. (*Ibid*.)

4. **During a Voluntary Leave for Good Cause, the Employee's Intent To Abandon Her Job May Be Shown Only by Evidence of Positive Repudiation of Her Duty To Return in the Clearest Terms**

We arrive at the same result here, but on a slightly different analysis. We begin with the recognition that the relationship between employer and employee is fundamentally contractual in nature. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 677.) During any voluntary absence from work for good cause, the employee's ongoing contractual duty to show up for work and the employer's counterpart duty to pay wages are temporarily suspended, with the mutual expectation that those duties will resume upon the employee's return. (*Lewis v. Unemployment Ins. Appeals Bd.* (1976) 56 Cal.App.3d 729, 739.) As we have observed, that was the status of the

24

parties' relationship when Johar left.  At the time of Johar's departure, both parties expected a future resumption of work, though what they intended from that point on—individually and mutually—is, as the *Kelley* court described the record in that case, "rife with ambiguity."  (*Kelley, supra,* 223 Cal.App.4th at p. 1077.)

In resolving questions of ineligibility for benefits under section 1256, any assessment of the "employee's intent ' "must take account of ' "real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce correlative results, adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith." ' " ' "  (*Paratransit, supra,* 59 Cal.4th at p. 559.)  Within the framework established by *Paratransit*—which requires an assessment of the employee's subjective intent evaluated in the context of the objective circumstances known to her and in which she was operating—what we have here is essentially a question of anticipatory breach of contract.  An anticipatory breach of contract occurs when one contracting party " 'positively repudiates the contract by acts or statements indicating that [she] will not or cannot substantially perform essential terms thereof . . . .' [Citation.]  'Anticipatory breach must appear only with the clearest terms of repudiation of the obligation of the contract.' "  (*Guerrieri v. Severini* (1958) 51 Cal.2d 12, 18; *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2019) 42 Cal.App.5th 918, 940.)

In the eight days between Johar's departure and October 31 (the "quit" date SWS reported to the EDD) or for that matter in the 13 days between her departure and the day Carol Johnson sent out Johar's "final check," nothing on this record comes close to meeting this test.  SWS took the position in the proceedings before the ALJ that Johar's intention to quit may be inferred by

25

her silence in the face of Mari Lynn Johnson's post-departure requests for a specific return date. But that is not enough to show a repudiation of future contractual duties. The emails of record show that Johar did eventually respond, saying she would "get back to you when the emergency ceases." But even if we assume arguendo she failed to respond at all, as Mari Lynn Johnson testified, the evidence is still insufficient to show a "positive[]" repudiation in "the clearest terms." (*Guerrieri v. Severini, supra*, 51 Cal.2d at p. 18.)

If Mari Lynn Johnson had set a date certain in advance of Johar's departure—which, as Johar's supervisor, she had the prerogative to do—and if Johar had then failed to report for duty in defiance of that directive or failed to request extended leave when the expected return date arrived, we might have seen things differently. But those are not the facts. SWS never tested Johar's willingness to return by ordering her to appear on a specified date, just as in *Kelley*, the employer never tested whether what appeared to be "demands" amounted to posturing during a settlement stand-off between lawyers. (*Kelley, supra*, 223 Cal.App.4th at p. 1077.) Although the trial court found "the circumstances of [Johar's] separation from her employer were confusing," the responsibility for the murkiness of the record must fall on SWS.

What *Paratransit* and *Kelley* teach is that, in a situation where section 1256 eligibility turns on the employee's intent, we must assess the employee's conduct from her perspective in light of objective circumstances known to her, especially in high conflict situations in the workplace where misunderstandings are common. (*Paratransit, supra*, 59 Cal.4th at p. 559 [" ' "one cannot determine whether an employee's action is misconduct within the humanitarian purpose of the unemployment compensation statutes

26

without judging the reasonableness of his act *from his standpoint in the light of the circumstances facing him and the knowledge possessed by him at the time*" ' "; italics in original]; *Kelley, supra,* 223 Cal.App.4th at p. 1079 [constructive voluntary quit doctrine "does not apply to those situations in which the employee makes requests or inquiries about employment matters, even though the employer may consider such speech irritating or ungracious"].)  Here, by failing to make *its* expectations clear ahead of Johar's trip, SWS created the conditions that made Johar's conduct in the period after her departure difficult to evaluate.

After Johar left, the only affirmative evidence of an intention to end the employment relationship prior to November 4 came from SWS, first in a text on October 23 where Mari Lynn Johnson said she would stop "payroll" for Johar as of October 22 and had hired another salesperson, and then on October 30, when Mari Lynn Johnson told Johar in an email, "Costco requires all consultants to be finger printed and licensed . . ."; "As of now, you do not qualify"; and, "We're done here."  There is also plenty of evidence that SWS was motivated to fire Johar over what it clearly perceived to be ongoing performance-related issues, but that it also wanted to avoid openly discharging her because of the evident risk of a retaliation claim following Johar's allegations of workplace discrimination.[11]

By contrast, during the critical period at the end of October and the beginning of November, there is no affirmative evidence of anything said or done by Johar that points to her as the moving party wishing to end the employer-employee relationship.  There is only what the Johnsons characterized in their testimony as Johar's failure to respond to her supervisor's requests for a specific return date after she left.  But during a

---

[11] See *ante*, page 11, footnote 6.

period when Johar was in the midst of domestic circumstances serious enough to qualify as good cause under section 1256-10 of the EDD Regulations, no reasonable fact finder could infer an intention to quit from a failure or inability to respond, even accepting the Johnsons' testimony on this point as true. All in all, in the absence of anything more than this record shows, the presumption against a voluntary quit must dictate the outcome.

**5. The Evidence of Johar's "Unlicensed" Status Does Not Overcome the Presumption Against a Voluntary Quit**

The only aspect of the record that might save the EDD's ineligibility determination is the evidence bearing upon Johar's "unlicensed" status.

Arguably, if Johar were at fault for failing to secure a credential that was necessary for her to visit customers' homes, thus making her return to work impossible, that could support a determination she voluntarily quit when work was available. (EDD Regulations, § 1253(c)-1, subd. (f) ["To be considered available [for work] under Section 1253(c) of the Code," which is a threshold requirement of eligibility for unemployment insurance benefits, "a Claimant must keep current all licenses, certificates, and memberships necessary for him or her to be legally employed in his or her usual occupation or profession"]; cf. EDD Regulations, § 1256-1, subd. (f), example 3 [employee's refusal to join union and pay union dues as required by terms of collective bargaining agreement is a constructive voluntary quit because, by forcing the employer to terminate the employment relationship, it set in motion the events leading to the employee's job loss].) Mari Lynn Johnson attempted to invite such a finding with her testimony raising the issue of "licensing" at the ALJ hearing. There, she testified that Johar had failed to provide complete information in support of a pending CSLB "license" application and that, as a result, Johar would have been ineligible to work

28

even if she had announced her readiness to resume her sales duties after returning from Chicago.

Neither the ALJ nor the CUIAB found any significance to this testimony. Nor did they find significance to Mari Lynn Johnson's reference in her October 30 email to a Costco policy requiring "all consultants to be finger printed and licensed," or to the ambiguous remark at the end of that email, "You do not qualify." And they were correct not to rely upon any of it. The allusions Mari Lynn Johnson made to "licens[ing]" and "finger print[ing]" in her October 30 email, as vaguely stated in that email, and as clarified in her later testimony, were untethered to *Johar's knowledge and understanding* of those matters. Because nothing in the administrative record shows or can be read to support a reasonable inference that Johar had knowledge her CSLB application was incomplete, this evidence lacked any evidentiary foundation that might have made it relevant to the issue of Johar's eligibility under section 1256 for unemployment benefits.[12]

To prove volitional conduct by Johar that made her return to work impossible, thus warranting an inference of a voluntary quit because she set in motion a series of events that blocked her from resuming her duties, SWS

---

[12] The new evidence Johar proffered to the CUIAB included proof that (1) SWS submitted Johar's home improvement salesperson registration application to the CSLB for her in early October 2019, and (2) after receipt of such applications, the CSLB typically sends an acknowledgement notice informing the applicant a set of fingerprints must be provided to the CSLB within 90 days. To lay a foundation that would have made Mari Lynn Johnson's suggestion that Johar failed to provide information necessary to complete her CSLB "license" application relevant, SWS would have had to prove that it passed on to Johar the CSLB's acknowledgment notice or that it advised her of the pending need for more information. The only evidence bearing on this issue, which may be found in Johar's testimony, was that SWS did not tell her there was any deficiency in her CSLB "licensing" application.

had to demonstrate some degree of fault on her part prior to November 4. That was the crucial timeframe during which Johar's intent was in issue. The eventual voiding of the CSLB application months later—confirmed by a notice dated February 7, 2020, after Johar had applied for unemployment benefits—was irrelevant unless SWS could prove Johar knew or should have known prior to November 4, 2019, that the CSLB was bound to reject her application if she did not take corrective steps to cure defects in it. Having raised the "licensing" issue in the ALJ hearing, SWS had a full opportunity and every incentive to present such evidence, but it failed to do so.

**6. The New Evidence Proffered by the Hastings Clinic Was Not Pivotal**

Even though, on the existing administrative record, the "licensing" evidence was irrelevant to the question whether Johar voluntarily quit when work was available, the Hastings Clinic, spotting an opportunity to turn the issue in Johar's favor, tried to make it relevant. Following the ALJ's adverse decision against Johar, the Clinic investigated the "license" issue and discovered some new evidence, which it proffered in support of Johar's CUIAB appeal. If the new evidence were credited, it would certainly cast fresh doubt on the credibility of both Johnsons. According to the Clinic, the new evidence suggests that SWS sabotaged Johar's CSLB "license" application by altering the address listed on it so that any requests for follow-up information from the CSLB would never reach Johar. In effect, the Clinic argued, SWS set Johar up for the inevitable voiding of her "license" application by CSLB, and thus manufactured a reason to claim she was "disqualified" from working even if she did wish to return to work.

This issue drove the result in the trial court. The court focused exclusively on the CUIAB's refusal to consider the Clinic's new evidence and resolved Johar's mandamus petition by vacating the CUIAB's decisions and

30

remanding the case for further factfinding under *Land v. California Unemployment Insurance Appeals Board, supra,* 54 Cal.App.5th 127. That gave Johar a narrow procedural victory—vacatur of the CUIAB's merits, reimbursement and penalty decisions, entry of a judgment of dismissal, and remand for reconsideration—but one that left her eligibility for unemployment benefits unaddressed. Here on appeal, in defense of the trial court's judgment of dismissal, the CUIAB and the EDD argue solely that the trial court had broad discretion to handle the matter in this way, and that since vacatur was within the range of reasonable choices a trial court was empowered to make, we should affirm and allow the matter to play out in further administrative proceedings. The CUIAB and the EDD do not address Johar's argument that she was entitled to mandamus relief on the merits as a matter of law.

With Johar, we see no need for further administrative proceedings. The additional evidence that the CUIAB has been directed to consider raises a host of credibility and other issues relating to her CSLB credentialing status, but we resolve this appeal on grounds that do not require consideration of those questions. The Clinic's new evidence is not pivotal in the same way the newly developed evidence in *Land* was to the benefits claim there. (*Land, supra,* 54 Cal.App.5th at p. 144.) In *Land*, the new evidence showed that the chronology of events underlying the section 1256 ineligibility determination could not have happened. (*Land,* pp. 143–145.) What we have here, while certainly relevant—is not so singularly dispositive.[13] To resolve this appeal on the merits, we need not decide whether, contrary to the testimony from Mari Lynn and Carol Johnson, Johar's departure from SWS

---

[13] Johar's February 28, 2022 request that we take judicial notice of a trial court order on remand in the *Land* proceedings is denied.

was a de facto termination. We simply hold that, *on the existing administrative record*, the evidence is insufficient to overcome the presumption against a voluntary quit. In the end, the murkiness of the record calls for a reversal, not a remand for more factfinding when SWS failed to bear its burden of overcoming the section 1256 presumption favoring Johar the first time around. The governing statutory scheme places a priority on expedition, and that priority is no less important in mandate proceedings at the end of the administrative process.[14]

### 7. Johar Is Entitled to 10 Percent Prejudgment Interest on the Unemployment Compensation Benefits That Were Erroneously Denied to Her

When a court holds that unemployment benefits were erroneously denied, the appropriate remedy generally is a writ of mandate compelling the EDD to award the wrongfully withheld benefits, plus 10 percent interest calculated from dates the payments were due. (*Robles v. Employment Development Dept.* (2012) 207 Cal.App.4th 1029, 1036; *Robles v. Employment Development Dept.* (2015) 236 Cal.App.4th 530, 547, 549; *Brown, supra*, 20 Cal.App.5th at pp. 1114–1115.) That is the remedy we will order in this case. As we explained in *Brown*, "Prejudgment interest is awardable in a mandamus action involving the improper denial of unemployment benefits 'because the requirements for the additional award of interest are met once the court determines the [CUIAB] wrongfully denied benefits.' " (*Brown*, at

---

[14] Having concluded the CUIAB's affirmance of the EDD's ineligibility determination was in error, we need not address any of the remaining grounds for reversal of the judgment that Johar advances. Nor is there any need to address whether the CUIAB erred in upholding the EDD's reimbursement or penalty orders, since those orders depend on and thus must fall with the CUIAB's erroneous ruling that Johar is not eligible for unemployment benefits under section 1256.

p. 1115; see Civ. Code § 3287, subd. (a).)  Under the *Robles* and *Brown* line of cases, Johar is entitled to an award of 10 percent prejudgment interest on the benefits which she would have received had the EDD correctly overruled SWS's protest of her unemployment insurance claim.

## III. DISPOSITION

We reverse the judgment.  On remand, the trial court shall calculate the amount of the benefits Johar would have been entitled to receive had the EDD not erroneously ruled that she is disqualified from receiving benefits under section 1256 (*Robles v. Employment Development Dept.*, *supra*, 236 Cal.App.4th at pp. 547, 549), plus prejudgment interest on that amount (*Brown*, *supra*, 20 Cal.App.5th at pp. 1114–1115).  A new judgment shall then be entered granting the requested writ relief.  The writ shall (1) direct the CUIAB to vacate its decisions in case Nos. AO-442067, AO-442068 and AO-442069, and (2) direct the EDD to pay Johar the amount of benefits she was erroneously denied, plus prejudgment interest thereon.  Costs on appeal are awarded to Johar.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
BROWN, J.

33

Trial Court:  Superior Court of California, County of Alameda

Trial Judge:  Hon. Michael M. Markman

Counsel:  Garfinkle Law Office, Gary S. Garfinkle and Maria J. Garfinkle, for Plaintiff and Appellant.

Rob Bonta, Attorney General, Cheryl L. Feiner, Senior Assistant Attorney General, Gregory D. Brown, Jennifer G. Perkell, Supervising Deputy Attorneys General, Julia A. Clayton, Ricardo Enriquez, Deputy Attorneys General, for Respondents.